DOUGLAS M. MILLER (Cal. Bar No. 240398)
Email: millerdou@sec.gov
ROBERTO A. TERCERO (Cal. Bar No. 143760)
Email: terceror@sec.gov

Attorneys for Plaintiff
Securities and Exchange Commission
Michele Wein Layne, Regional Director
Katharine Zoladz, Associate Regional Director
Gary Y. Leung, Regional Trial Counsel
444 S. Flower Street, Suite 900
Los Angeles, California 90071
Telephone: (323) 965-3998
Facsimile: (213) 443-1904

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION, <br><br> Plaintiff, <br><br> vs. <br><br> JOSEPH R. EARLE, JR., BARRY D. REAGH, WILLIAM CLAYTON, FRANCIS T. DUDLEY, STEVEN E. BRYANT, UPPER STREET MARKETING, INC. and PROJECT GROWTH INTERNATIONAL, INC., <br><br> Defendants. | Case No. 3:22-cv-1914-H-MDD <br><br> **SECOND AMENDED COMPLAINT** |

Plaintiff Securities and Exchange Commission ("SEC") alleges:

### JURISDICTION AND VENUE

1.     The Court has jurisdiction over this action pursuant to Sections 20(b), 20(d)(1) and 22(a) of the Securities Act of 1933 ("Securities Act"), 15 U.S.C. §§ 77t(b), 77t(d)(1) & 77v(a), and Sections 21(d)(1), 21(d)(3)(A), 21(e) and 27(a) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§ 78u(d)(1), 78u(d)(3)(A), 78u(e) & 78aa(a).

2.     Defendants have, directly or indirectly, made use of the means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange in connection with the transactions, acts, practices and courses of business alleged in this complaint.

3.     Venue is proper in this district pursuant to Section 22(a) of the Securities Act, 15 U.S.C. § 77v(a), and Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa(a), because certain of the transactions, acts, practices and courses of conduct constituting violations of the federal securities laws occurred within this district.

## SUMMARY

4.     This case involves a fraudulent pump-and-dump scheme in the publicly traded stock of UPPR, a company traded on the over-the-counter ("OTC") market, as well as the unregistered offer and sale of UPPR's stock in furtherance of that scheme.

5.     Between on or about January 16, 2019 and June 28, 2019, Joseph R. Earle, Jr. ("Earle"), the former chief executive officer of UPPR, together with Barry D. Reagh ("Reagh"), and Francis T. Dudley ("Dudley"), artificially inflated the price and trading volume of UPPR's stock by disseminating purportedly positive information about the company that was in truth false and misleading.  They did this to "pump" the price of UPPR's stock up, so that Reagh, William Clayton ("Clayton") and others acting at their behest could sell or "dump" the UPPR stock they owned and controlled for a profit.  In total, the scheme resulted in Reagh, Clayton and others receiving over $1 million in proceeds and it required the SEC to temporarily suspend trading in UPPR's stock.

6.     Before and during the "pump," UPPR, Earle, Reagh, Clayton and Dudley each engaged in fraudulent and deceptive conduct in furtherance of the scheme, including making materially false and misleading statements.

7.     Before the "pump," and beginning on December 6, 2017, Clayton and Reagh submitted false and misleading securities deposit forms to "Broker A," so that the UPPR stock they owned and controlled could be deposited into brokerage

accounts and later sold (or "dumped") to the public.  The deposit forms that Clayton and Reagh submitted, and caused others to submit, falsely and misleadingly claimed, among other things, that Reagh had no interest in the UPPR shares being deposited into the brokerage accounts and that no one would coordinate with Reagh in the sale of the UPPR shares.  In reality, however, Reagh was the beneficial owner of the deposited shares, and most, if not all, of the sales executed in those accounts were coordinated with Reagh.

8.     During the "pump," Earle, acting on behalf of UPPR, made false and misleading statements in the public filings that UPPR submitted to OTC Markets Group LLC ("OTC Markets Group"), which were then made available to the public on its website (otcmarkets.com).  Specifically, Earle:  (i) made false and misleading statements about the terms under which UPPR would receive $10 million in financing; and (ii) hid from investors the fact that he had hired Steven E. Bryant ("Bryant") and his company, Project Growth International, Inc. ("Project Growth"), two unregistered brokers, to conduct an unregistered and purportedly private offering of UPPR's stock.  Unbeknownst to the other investors, this offering raised approximately $4.6 million and resulted in the issuance and sale of millions of additional shares of UPPR's stock, significantly diluting the value of its shares, resulting in a lower stock price and harming existing investors.

9.     During the "pump," UPPR, Earle, Reagh, and Dudley also touted and promoted UPPR's stock over the internet, using press releases, OTC Markets Group filings, social media, banners on financial websites, and stock research reports, to drive up UPPR's stock price and trading volume.  The stock research reports that Dudley drafted, and caused others to draft, were false and misleading.  They claimed that those reports had been paid for by Dudley's own media company when, in fact, the payment for these purportedly independent research reports about UPPR's stock had actually come from UPPR and Reagh.  These research reports also concealed from investors the fact that Reagh, who helped pay for the reports, was a beneficial

owner of UPPR stock, and he planned to sell a substantial amount of UPPR stock after Dudley issued the research reports to the public.

10.     Through their conduct:  (1) defendant UPPR violated Sections 5(a), 5(c) and 17(a)(1) and (a)(3) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a)(1), and 77q(a)(3), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (2) defendant Earle violated Sections 5(a), 5(c) and 17(a) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (3) defendant Reagh violated Sections 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and (c) thereunder, 17 C.F.R. §§ 240.10b-5(a) and (c); (4) defendant Clayton violated Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; (5) Dudley violated Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b), and Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 thereunder, 17 C.F.R. § 240.10b-5; and (6) defendants Bryant and Project Growth violated Sections 5(a) and 5(c) of the Securities Act, 15 U.S.C. §§ 77e(a), 77e(c), and Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

11.     Accordingly, the SEC seeks an order against each defendant permanently enjoining them from future violations of these Securities Act and the Exchange Act provisions, requiring them to pay disgorgement plus prejudgment interest on any ill-gotten gains, and to pay a civil penalty.  The SEC further seeks against defendants Earle, Reagh, Clayton and Dudley, an order barring them from acting as an officer or director of a public company, and barring them from offering or selling penny stock.

## THE DEFENDANTS

12.     **Joseph R. Earle, Jr.**, age 68, resides in Wentzville, Missouri.  He was UPPR's chief executive officer and director from in or about October 2018 through in

3:22-cv-1914-H-MDD

or about December 2020.  Earle was a registered representative for approximately fifteen (15) years, most recently in 2004, and previously held Series 1, 7, 24 and 63 qualifications.

13.   **Barry D. Reagh,** age 59, resides in Scottsdale, Arizona and Surrey, British Columbia, Canada.  In November 2001, the Canadian Venture Exchange permanently withdrew Reagh's exchange approval and imposed a fine against him for manipulative trading.

14.   **William Clayton**, age 54, resides in Gilbert, Arizona.  He served as the Managing Member of Natal Holdings, LLC and was a signatory on Tezi Advisory, Inc.'s bank account.

15.   **Francis T. Dudley**, age 66, resides in Key Largo, Florida.  He is the Managing Member of Venado Media, LLC, a stock promotion firm.

16.   **Steven E. Bryant**, age 71, resides in Oviedo Beach, Florida.  Bryant was a registered representative for eighteen (18) years, most recently in 2005, and previously held Series 7, 24 and 63 qualifications.  In 2008, FINRA entered a default decision, barring Bryant from association with any FINRA member in any capacity for operating an unregistered dealer.

17.   **Upper Street Marketing, Inc**., is an Oklahoma corporation with headquarters in Raleigh, North Carolina.  Its stock was quoted on OTC Link under the ticker symbol UPPR until June 27, 2019, when the SEC suspended trading in its securities for ten (10) business days.  *See* Exchange Act Rel. No. 34-86228 (Jun. 27, 2019).

18.   **Project Growth International, Inc**., was incorporated in Florida, with its principal place of business in Deerfield Beach, Florida, but it is now inactive.  It claimed to be in the business of locating potential investors for its issuer clients, and Bryant served as its president.

## RELEVANT INDIVIDUALS AND ENTITIES

19.   **"D.R.,"** age 87, resides in Point Roberts, Washington and Surrey, British

Columbia, Canada.  He is a close relative of Reagh and from 2017 to 2021, he served almost continually as the president and director of F.A. Ventures, LLC ("F.A. Ventures").

20.    **"G.M.,"** age 66, resides in British Columbia, Canada.  He is a longtime acquaintance of Reagh and served as the chief executive officer of UPPR from approximately 2014 through October 1, 2018 and as its director from 2014 to 2020.

21.    **"R.R.,"** age 63, resides in Norfolk, Virginia.  He is an employee of the Transportation Security Administration ("TSA") and a longtime acquaintance of Reagh.

22.    **F.A. Ventures Inc. ("F.A. Ventures")** was incorporated in Nevada, with its principal place of business in Scottsdale, Arizona, but it is now in default.  At various times, either Clayton, D.R., or both have been its officers and directors.  During the relevant period, "D.R." served as its president and director, and Clayton served as its treasurer.  At all relevant times, however, Reagh controlled F.A. Ventures.

23.    **Natal Holdings, LLC ("Natal"),** is an Arizona limited liability corporation with its principal place of business in Gilbert, Arizona.  Clayton served as its Managing Member.  At all relevant times, however, Reagh controlled Natal.

24.    **Tezi Advisory, Inc. ("Tezi")**, was incorporated in Nevada with its principal place of business in Scottsdale.  "G.M." served as Tezi's president, treasurer, and beneficial owner.  In January 2016, Clayton became a signatory on Tezi's bank account and remained one until August 28, 2019.  Even though its corporate status was revoked in April 2016, Tezi continued to operate and held G.M.'s shares in UPPR.

25.    **Venado Media, LLC ("Venado Media"),** was incorporated in Texas and before it forfeited its right to transact business in 2020, it was based in Houston, Texas.  It was a market awareness firm and Dudley served as Managing Member.

**THE ALLEGATIONS**

**A.    Earle Takes Control of UPPR**

26.    In or about spring 2018, Earle became the chief financial officer of Growing Springs, LLC ("Growing Springs").  The company sold what it called liquid conversion technology exclusively to companies in the cannabis and hemp agricultural industries.  According to its marketing materials, this technology allowed growers to achieve higher crop yields while reducing water runoff and the need for fertilizer.

27.    In or about July 2018, Earle wanted to expand the business of Growing Springs and pursue marijuana cultivation and dispensaries.  Earle began looking to merge Growing Springs with a publicly traded company to access the public capital markets.

28.    On or about July 18, 2018, Earle met with G.M., who was then the chief executive officer of UPPR.  The stock of UPPR traded publicly through OTC Link but its business had been dormant for a number of years.  Earle and G.M. discussed merging their two companies and raising capital to fund and expand the business operations of Growing Springs.

29.    G.M. introduced Earle to Reagh.  Reagh and G.M. jointly controlled UPPR.  Reagh also controlled a large block of UPPR's shares through various entities that held UPPR shares.  These entities included F.A. Ventures, which Reagh controlled through D.R., his 87-year old close relative, and Natal, which Reagh controlled through Clayton, a longtime acquaintance.

30.    In or about August 2018, Earle formed Growing Springs Holdings Corporation ("GSHC"), a Nevada corporation, and became its sole owner, president, treasurer and secretary.  GSHC acquired all of the assets of Growing Springs in a reverse merger.

31.    On or about October 1, 2018, Earle and G.M. entered into an Agreement and Plan of Merger between GSHC and UPPR.  Under the terms of the Agreement

and Plan of Merger, GSHC received shares in UPPR as part of a stock swap.  Earle, the sole shareholder of GSHC, received 27,000,000 common shares of UPPR.

32.     Concurrent with the closing of this transaction, Tezi entered into an Assignment of Common Stock agreement with Earle.  Under the terms of the agreement, Tezi assigned to Earle 23,000,000 common shares of its UPPR stock for a de minimis payment of $10.  These two transactions made Earle the majority shareholder of UPPR, and he took over as its president and CEO.

**B.     The Overall Pump-and-Dump Scheme**

33.     At or around the time of the merger between UPPR and GSHC, Earle and Reagh agreed they would use UPPR for a pump-and-dump scheme.

34.     Reagh would allow Earle to become the majority shareholder of UPPR and president of the company.  Earle would use his in-depth understanding of the hemp and cannabis industries to serve as the "operator" of the business.  In other words, Earle would run the "back office" portion of the scheme, signing agreements, submitting periodic reports with OTC Markets Group, and running the day-to-day business operations of the company.  This would allow Earle to make certain business decisions on behalf of UPPR, which he and others would tout as making UPPR a good investment and adding value to its stock.

35.     In exchange for allowing Earle to take over the operations of the company and providing funding for those operations, Earle and Reagh agreed to use UPPR for a pump-and-dump scheme.

36.     The scheme primarily consisted of four parts.  First, Reagh agreed to have individuals acting at his behest, including at least D.R. and Clayton, deposit a large block of UPPR shares into a brokerage account with Broker A.  The DSR forms submitted in connection with that share deposit contained false and misleading statements in order to induce Broker A into accepting the shares, which later allowed Reagh to sell the UPPR shares he controlled to the public.  The DSR forms, among other things, concealed the fact that Reagh was the beneficial owner of those shares

and that most, if not all, of the sales executed in the brokerage accounts would be coordinated with Reagh.

37.    Second, Earle agreed to conduct an unregistered and purportedly private offering of UPPR's stock in order to fund the business operations of UPPR and to help pay for a promotional campaign.

38.    Third, UPPR, Earle, Reagh, and Dudley agreed to conduct the promotional campaign using press releases, OTC Markets Group filings, social media, banners on financial websites, and stock research reports, which they designed to drive up the price of UPPR's publicly traded stock and its trading volume.  They widely disseminated this positive but often false and misleading information about the company.  For example, Earle made false and misleading statements in the OTC Markets Group filings about the terms under which UPPR would receive $10 million in financing and concealed the fact that UPPR had conducted an unregistered offering, resulting in the issuance of millions of additional shares of UPPR's stock, significantly diluting its value.

39.    Fourth and finally, at or around the time the price of UPPR stock was artificially inflated, Reagh, Clayton, and others acting at their behest sold the UPPR shares they owned or controlled for a substantial profit.

C.    **The Scheme to Deposit UPPR Shares with Broker A**

40.    Reagh and Clayton used Broker A to carry out the first part of the scheme – depositing large blocks of UPPR shares that they owned and controlled into a brokerage account, so they could later sell them to the public.

1.    **December 5, 2018 False and Misleading DSR**

41.    On or about December 5, 2018, Clayton, on behalf of Natal, submitted a DSR to Broker A, using forms provided by Broker A.  The DSR sought to deposit one million shares of UPPR stock with Broker A.  As part of the DSR, Clayton had to fill out a questionnaire and make certain representations under oath regarding the UPPR shares he wanted to deposit with Broker A.  Clayton had to update the

information in the DSR if it subsequently changed.

42.    Broker A made it clear on its DSR forms that it would rely on the responses contained in the questionnaire and the representations made by Clayton to determine whether depositing the UPPR shares in its brokerage account complied with securities laws.

43.    In the DSR, Clayton falsely represented, among other things, that the UPPR shares deposited with Broker A were solely owned by Natal and that no other person(s) or entity(ies) had any claim or right to ownership of the shares or any portion of the sales proceeds.  In addition, Clayton falsely represented that any sale of UPPR's stock would not be coordinated with others or with sales by other stockholders.

### 2.    December 6, 2017 False and Misleading DSR

44.    The DSR form Clayton submitted to Broker A was almost identical to one Reagh's close relative, D.R., had submitted to Broker A approximately one year earlier.  On or about December 6, 2017, D.R. made essentially the same false and misleading representations that Clayton made in his DSR, except D.R. did so on behalf of F.A. Ventures and in connection with the deposit of 520,000 shares of its UPPR stock.

### 3.    The DSRs Concealed Beneficial Ownership, the Actual Recipients of Sales Proceeds, and the Coordinated Sales

45.    The representations in the DSRs submitted by Natal and F.A. Ventures were materially false and misleading in at least three ways.  First, the UPPR shares were not solely owned by Natal and F.A. Ventures.  Reagh was the beneficial owner of those UPPR shares.  In fact, Reagh has admitted that both accounts belonged to him.  This representation was material.  A reasonable investor would consider it important to his or her investment decision to know this information.  The representation was also material because Broker A would not have accepted the UPPR shares for deposit had it known the ownership information was false and

misleading.

46.    Second, Natal and F.A. Ventures did not solely receive the proceeds from the sales of the UPPR shares.  Reagh received, directly and indirectly, a large share of the proceeds generated from the sale of the UPPR shares in the Broker A accounts.  Natal received about $758,000 from the "dump."  Clayton transferred about forty percent (40%) of the money that Natal received from the sale of its UPPR shares to Reagh, in part, by writing over $225,000 worth of checks payable to D.R., a close relative of Reagh.  Below is a chart showing several of the payments Clayton made to Reagh using funds received from the sale of Natal's UPPR shares:

| Payment Date | Payment Amount | Payment From | Payment To |
|---|---|---|---|
| 4/26/2019 | $6,400 | Clayton | D.R. |
| 5/2/2019 | $7,600 | Natal | D.R. |
| 5/8/2019 | $4,750 | Natal | D.R. |
| 5/10/2019 | $9,500 | Natal | D.R. |
| 5/12/2019 | $2,850 | Natal | D.R. |
| 5/14/2019 | $12,250 | Natal | D.R. |
| 5/17/2019 | $9,800 | Natal | D.R. |
| 5/20/2019 | $7,775 | Natal | D.R. |
| 5/22/2019 | $9,500 | Natal | D.R. |
| 5/23/2019 | $9,400 | Natal | D.R. |
| 5/28/2019 | $9,500 | Natal | D.R. |
| 5/29/2019 | $13,300 | Natal | D.R. |
| 6/4/2019 | $9,000 | Natal | D.R. |
| 6/7/2019 | $3,600 | Natal | D.R. |
| 6/11/2019 | $10,000 | Natal | D.R. |
| 6/12/2019 | $28,000 | Natal | D.R. |
| 6/17/2019 | $10,000 | Natal | D.R. |
| 6/20/2019 | $42,500 | Natal | D.R. |
| 7/1/2019 | $20,000 | Natal | D.R. |

47.    Like Natal, the proceeds from the sale of the UPPR shares in the F.A. Ventures account (totaling about $228,000) went to Reagh through accounts F.A. Ventures opened in Belize ("BZ") and over which Reach had authority and control.

Below is a chart showing several examples of how the proceeds from the sale of F.A. Venture's UPPR shares were used for the benefit of Reagh:

| Payment Date | Payment Amount | Payment From | Payment To |
|---|---|---|---|
| 10/23/2018 | $4,000 | F.A. Ventures | F.A. Ventures (BZ) |
| 12/19/2018 | $4,500 | F.A. Ventures | F.A. Ventures (BZ) |
| 1/4/2019 | $3,000 | F.A. Ventures | F.A. Ventures (BZ) |
| 1/21/2019 | $8,500 | F.A. Ventures | F.A. Ventures (BZ) |
| 1/28/2019 | $6,800 | F.A. Ventures | F.A. Ventures (BZ) |
| 1/30/2019 | $9,500 | F.A. Ventures | F.A. Ventures (BZ) |
| 2/4/2019 | $4,750 | F.A. Ventures | F.A. Ventures (BZ) |
| 2/6/2019 | $9,750 | F.A. Ventures | F.A. Ventures (BZ) |
| 2/11/2019 | $7,950 | F.A. Ventures | F.A. Ventures (BZ) |
| 3/13/2019 | $7,700 | F.A. Ventures | F.A. Ventures (BZ) |
| 4/1/2019 | $9,800 | F.A. Ventures | F.A. Ventures (BZ) |
| 4/16/2019 | $4,500 | F.A. Ventures | F.A. Ventures (BZ) |
| 4/19/2019 | $4,000 | F.A. Ventures | F.A. Ventures (BZ) |
| 5/21/2019 | $9,000 | F.A. Ventures | F.A. Ventures (BZ) |
| 5/23/2019 | $9,650 | F.A. Ventures | F.A. Ventures (BZ) |
| 5/28/2019 | $8,800 | F.A. Ventures | F.A. Ventures (BZ) |
| 5/29/2019 | $9,800 | F.A. Ventures | F.A. Ventures (BZ) |

48.     Third, Clayton coordinated almost all of the sales of the UPPR shares with Reagh.  According to telephone and trading records, Clayton spoke to Reagh the same day as virtually all the sell trades placed in the Natal brokerage account. Clayton and Reagh exchanged calls using a telephone paid for by Natal.  Below is a chart showing several of the trades executed in the Natal brokerage account at Broker A and the calls between Clayton and Reagh the day of those trades:

| Date | Shares Sold | Account | Amount | # of calls |
|---|---|---|---|---|
| 5/1/2019 | 5,000 | Natal | $2,184.47 | 6 |
| 5/7/2019 | 20,000 | Natal | $9,224.27 | 2 |
| 5/8/2019 | 8,000 | Natal | $4,061.30 | 4 |
| 5/9/2019 | 13,200 | Natal | $7,243.40 | 9 |
| 5/13/2019 | 13,500 | Natal | $7,711.6 | 4 |
| 5/14/2019 | 10,000 | Natal | $5,777.87 | 4 |

| Date | Shares Sold | Account | Amount | # of calls |
|---|---|---|---|---|
| 5/15/2019 | 9,000 | Natal | $5,368.87 | 5 |
| 5/16/2019 | 15,000 | Natal | $9,323.79 | 3 |
| 5/17/2019 | 15,000 | Natal | $10,325.76 | 9 |
| 5/22/2019 | 10,000 | Natal | $7,649.83 | 2 |
| 5/28/2019 | 20,000 | Natal | $15,653.17 | 2 |
| 5/29/2019 | 10,000 | Natal | $7,859.82 | 2 |
| 5/30/2019 | 10,260 | Natal | $8,062.14 | 9 |
| 5/31/2019 | 13,000 | Natal | $9,613.29 | 4 |
| 6/3/2019 | 8,500 | Natal | $6,437.31 | 4 |
| 6/5/2019 | 20,000 | Natal | $15,451.70 | 2 |

49.     Broker A would not have accepted the UPPR shares and the DSRs submitted by Natal and F.A. Ventures had it known that Clayton's representations regarding the ownership of the UPPR shares were materially false and misleading.

50.     Broker A would not have accepted the UPPR shares and the DSR's submitted by Natal and F.A. Ventures had it known that Clayton's representations regarding the absence of any coordination in the sale of those shares were materially false and misleading.

51.     Broker A would not have accepted the UPPR shares and the DSRs submitted by Natal and F.A. Ventures had it known that Clayton's representations regarding who would receive the proceeds from the sale of the shares were materially false and misleading.

52.     Additionally, a reasonable investor would have considered it important to his or her investment decision to know all of this information was false and misleading.

**D.     The Unregistered Offering of UPPR Shares**

53.     In or about September 2018, Earle began to carry out the second part of the scheme by looking for companies to assist him in the purportedly private offering of UPPR's shares.  One of the companies Earle hired for this purpose was Project Growth.

54.     On or about September 5, 2018, Bryant, the owner of Project Growth, sent Earle a draft of what he called a consulting agreement.  Under the terms of the agreement, Bryant agreed to identify sources of private capital for GSHC in exchange for a "consulting fee."  This non-exclusive agreement required GSHC to pay Project Growth a consulting fee of ten (10) percent plus three (3) percent in non-accountable expenses.  In addition to the 13% consulting fee, Project Growth would receive a warrant to purchase 4,000,000 shares of GSHC stock at $.10 per share for up to two years, but only if Project Growth raised a total of $600,000 for GSHC between September 4, 2018 and January 14, 2018.

55.     On or about September 6, 2018, Earle sent a draft of the agreement between GSHC and Project Growth to Reagh and G.M. for their review.  Earle then made changes to the agreement.

56.     Earle and Bryant, acting on behalf of UPPR and Project Growth, respectively, signed the agreement and began soliciting investors for UPPR's private offering.  Earle provided Bryant with "talking points" that he should use when soliciting investors.  These talking points explained that GSHC had merged with UPPR and focused on the "hyper-growth markets" associated with cannabis and hemp related goods and services in multiple states.

57.     Earle also provided Bryant with marketing materials about UPPR and subscriptions agreements for the investors to sign.  The marketing materials included brochures and slide decks about UPPR and links to the GSHC website.  The subscription agreements typically required a minimum investment amount of $25,000 and typically offered investors 250,000 shares of UPPR's common stock at $.10 per share, although the per share price increased over time.  All of the subscription agreements claimed that the private offering was exempt from SEC registration requirements.

58.     Bryant set up a boiler room inside the offices of Project Growth and began to cold call investors across the United States using lead lists that he purchased

or already had in his company's databases.

59.    Bryant had approximately nine people at Project Growth working on UPPR's private offering.  Approximately six people worked as "qualifiers," meaning they would call prospective investors to determine whether they were interested in the cannabis market and whether they were accredited investors.  If the investors stated that they were accredited, the qualifiers would ask investors if they were interested in receiving information about an investment opportunity with UPPR.

60.    If the investors expressed an interest, the qualifiers would arrange a call with one of Project Growth's three salespeople, which included Bryant.  During the calls, the salespeople told the potential investors UPPR's story and that it could not access traditional bank loans because of the cannabis-related banking laws and that UPPR was consequently pursuing capital through the sale of its stock.  The salespeople also told potential investors that UPPR stock was a good investment by explaining that the compensation component Project Growth valued most for itself was the opportunity to buy UPPR shares through warrants.  Project Growth said it valued this opportunity because of UPPR's favorable business prospects.

61.    If an investor wanted to buy UPPR stock, the salesperson sent them an email containing the marketing materials Bryant had received from Earle and the subscription agreement by which the investor could purchase UPPR stock.  Project Growth had investors forward the signed subscription agreement and payment to UPPR.

62.    No one took any steps, however, to verify whether the investors who claimed to be accredited investors actually were accredited.  Earle, Bryant and his staff at Project Growth instead relied on the responses the investors gave to the "qualifiers" and on the investor questionnaires included in some of the subscription agreements.

63.    On or about December 12, 2018, Earle and Project Growth entered into another consulting agreement related to UPPR's private offering.  The terms of this

agreement were largely the same as the September 5, 2018 agreement and it was carried it out in much the same manner, except this time Project Growth agreed to raise $1 million for GSHC between December 12, 2018 and April 12, 2019, in exchange for 19.8 percent of the capital raised. It also gave Project Growth a warrant to purchase 4,000,000 shares of GSHC stock, but only if Project Growth raised the $1 million.

64. Bryant and Project Growth solicited investors for the UPPR offering under the terms of these two agreements between in or about October 1, 2018 and July 31, 2019, raising a total of approximately $4.6 million from more than 100 investors across the United States.

65. Bryant kept track of the money that Project Growth earned for sales of UPPR stock, and did so on an investor-by-investor basis. Once a sale was completed, Bryant typically informed Earle and calculated the money that UPPR owed to Project Growth under their consulting agreements. As explained above, Bryant based his calculation on a percentage of the amount of money each investor invested. When UPPR was delinquent in making these payments, Bryant emailed Earle, detailing how much Project Growth was not paid.

66. UPPR paid Project Growth approximately $897,000 in sales commissions, or approximately 19.5% of the $4.6 million it raised on behalf of the company. Bryant personally received approximately $245,000 in commissions and about $129,000 in other payments from UPPR, totaling approximately $374,000. UPPR raised additional funds, about $1.3 million, through channels other than Project Growth for a total amount of about $5.9 million from about 132 investors.

67. No registration statement was ever filed for UPPR's private offering and, contrary to the statements in the subscription agreements, no exemptions from registration were available. For instance, although Earle, Bryant and Project Growth engaged in a general solicitation of investors, they made no effort to verify the accredited status of investors and none of the investors received access to the kind of

information that SEC registration would reveal, such as audited financial statements.

68.    Bryant and Project Growth also did not register with the Commission as brokers and were not associated with a registered broker-dealer during the offering.

**E.    The Touting and Promotional Campaign**

69.    On or about January 14, 2019, after UPPR started receiving funds from the private offering, Earle and Reagh began organizing the touting and promotional campaign they had agreed to deploy in order to drive up the price and trading volume of UPPR's publicly traded stock.  Earle hired Dudley, the owner of Venado Media, to assist him with the promotional campaign.

70.    On February 16, 2019, Dudley sent a budget proposal for a promotional campaign to Reagh.  Dudley described it as an "awareness" effort and said that it would cost $200,000.  Dudley proposed that the campaign include, among other things, the following:  three to four research reports to be distributed through ads on Facebook; re-releasing UPPR's press releases, and adding tags to them to increase their reach on the internet; using investor channels with active investors; and placing display banners on financial websites focused upon the cannabis industry.

**1.    The FBI Investigation**

71.    On or about February 11, 2019, at around the same time Earle contacted Dudley, Earle met with "Individual A" and "Individual B" to discuss whether they also wanted to be involved in the touting and promotional campaign.  Unbeknownst to Earle, both individuals were cooperating with the Federal Bureau of Investigation ("FBI") in a criminal investigation.  They secretly recorded their conversation with Earle.

72.    During the meeting, Earle told the FBI cooperators that he had "a whole litany of press releases ready to go" for the promotional campaign and they were "all positive" and "good news" about UPPR.  Earle said Project Growth was also helping find investors for UPPR's stock and he believed that all of this would make the demand for UPPR's stock very large.

73.     On or about February 26, 2019, Individual A spoke with Earle again over the telephone and secretly recorded that conversation.  After Individual A learned that Natal had deposited one million shares of UPPR stock with Broker A, he asked Earle who actually controlled those shares.  Earle told Individual A that Clayton, the individual listed as the owner of the Natal shares, took instructions from Reagh and that Reagh was the one who actually controlled Natal's one million shares.  Earle said Reagh also controlled the UPPR shares deposited by F.A. Ventures.

74.     Individual A asked Earle if he would send Individual A the budget for the promotional campaign.  Earle told Individual A that having a budget for the promotion campaign "gets into a dicey area" and he would rather have a conversation with Individual A "face-to-face."

75.     On or about February 21, 2019, Individual A spoke again with Earle over the telephone and again secretly recorded their conversation.  Individual A and Earle discussed UPPR's free trading shares and where they were deposited.  Earle said "we" have been depositing them at Broker A and said it had been a "tough hurdle" because of all Broker A's compliance requirements.

76.     Individual A asked Earle whether he would commit to spending $250,000 on the promotional campaign for UPPR's stock, even if that meant taking money out of the company's pockets.  Earle said, "Yeah, that's fine" but told Individual A they would have to "coordinate" that with Reagh.  Earle pointed out that he was already spending "5 grand a week" on a Facebook promotional campaign and said that was "really getting the volume up."

77.     On or about March 1, 2019, Individual A met with Earle in San Diego, California.  At least one other individual was present at the meeting.  Reagh later joined the meeting by telephone.  Individual A secretly recorded their conversation at this meeting.

78.     Earle told Individual A that he had "six press releases ready to go." Later on, when Reagh joined the meeting telephonically, Reagh acknowledged that

the one million shares Natal deposited at Broker A were his shares. Reagh even agreed to give Individual A the sign-in codes (or password) for the Natal brokerage account. Individual A made it clear that he wanted the password for the Natal brokerage account so that he and Reagh could "coordinate" the selling of the UPPR shares in the account.

79.  Individual A asked Reagh what his role was in the pump-and-dump scheme. Reagh said he had been wearing "a lot of hats" up to that point, including handling the investor relations in terms of handling investor calls, facilitating the paperwork necessary for depositing the shares, and assisting with the private offering documentation.

80.  Earle referred to himself, Reagh and G.M. as the "Three Musketeers." Earle said Reagh drafted the subscription agreements for the private offering and Earle edited them to fix all the typos.

81.  Earle described himself as the "operator" and the one who ran the "back office." According to Earle, Reagh and G.M. selected him for this role because of his in depth understanding of the hemp and cannabis industries and said this was the reasons why they gave him "the keys to the kingdom." Earle said it was his job to make sure all of the shares Reagh and G.M. controlled had value, and that they were worth something. For example, Earle said he used his relationships in the cannabis industry to secure agreements between UPPR and other companies and was the one who drafted all the press releases that touted those agreements and relationships.

## 2. The False and Misleading Research Reports about UPPR

82.  Between in or about January and June 2019, Dudley's company, Venado Media, distributed approximately five research reports like the ones Dudley suggested in his February 16, 2019 email to Reagh, where he put forward his $200,000 budget proposal for the promotional campaign. Venado Media distributed the research reports, which went out to the public on or about January 16, January 22, March 11, and June 3, 2019, through two of Venado Media's labels,

TheOTCReporter.com and DiscoveryStocks.com.

83.    The research reports discussed UPPR's business plans and prospects in glowing terms, such as "Congress just launched a $22 billion gold rush and UPPR has the home court advantage" and "UPPR saw the [hemp] boom coming and got in big.  They have 360 acres ready to go . . . NOW."

84.    Dudley reviewed each of the research reports.

85.    Earle reviewed and edited at least one of these research reports before and after Venado Media had disseminated it to the public.

86.    The research reports did not disclose that UPPR and Reagh had paid Dudley and Venado Media approximately $136,000 to write the research reports. Instead, the research reports falsely and misleadingly stated that the compensation for the research reports came from "Venado Media, LLC."  This information was material.  A reasonable investor would have considered it important in making an investment decision to know that UPPR, the company whose shares Venado Media promoted in the research reports, had paid Venado Media to write them.

87.    Moreover, Dudley knew, or was reckless and negligent for not knowing, that Reagh was the beneficial owner of UPPR stock at the time Reagh helped pay for the research reports.

88.    Dudley further knew, or was reckless and negligent for not knowing, that Reagh intended to sell, and to direct others to sell, some of his UPPR shares to the public once Dudley disseminated the favorable research reports to the public.  Dudley did not disclose any of this material information in the three research reports.

### 3.    The False and Misleading OTC Markets Group Filings

89.    On or about April 30, 2019, after the Venado Media promotional campaign had begun, UPPR made its annual submission to the OTC Markets Group website for the 2018 fiscal year ending on December 31, 2018.  Earle signed, certified, and uploaded the annual submission as UPPR's principal executive and financial officer.

90.     Section IV.B of the annual submission contained an "Issuance History" chart, which purported to show any new issuances or cancellations of UPPR shares. The Issuance History that Earle signed and certified as accurate in the annual submission was false and misleading in that it failed to include approximately $890,000 worth unregistered stock transactions that took place during the private offering of UPPR's stock in 2018, which resulted in the issuance of approximately 8.26 million additional UPPR shares.

91.     On May 21, 2019, approximately one month later, UPPR submitted its quarterly submission to the OTC Markets Group website for the first quarter of 2019 ending on March 31, 2018.  Like UPPR's 2018 annual submission, Earle signed and certified this quarterly submission as UPPR's principal executive and financial officer.

92.     Once again, Section IV.B of the quarterly submission contained an "Issuance History" chart, which purported to show any new issuances or cancellations of UPPR shares.  The Issuance History chart that Earle signed and certified as accurate for the quarterly submission was once again false and misleading in that it failed to include approximately $1.96 million worth of unregistered stock transactions that took place during UPPR's private offering in the first quarter of 2019, which resulted in the issuance of approximately 9.24 million additional shares.

93.     Earle knew at the time he signed and submitted these Issuance History charts as part of the OTC filings that he had issued additional shares of UPPR during its private offering that he had not reported to the transfer agent.  In fact, on or about February 21, 2019, during a recorded conversation with Individual A, Earle admitted that approximately 41 small investors had each purchased an average of $20,000 worth of UPPR stock that he still had not reported to the transfer agent.

94.     The false and misleading information about UPPR's issuances of its shares was material.  A reasonable investor would consider it important to his or her

investment decisions to know that there were more – and in this instance millions more – shares of UPPR stock issued.

95.     On or about May 8, 2019, UPPR made another false and misleading statement in an OTC Markets Group submission regarding its financial condition.  In the submission, titled "Supplemental Information," UPPR reported that on April 23, 2019 it had secured $550,000 in financing through a convertible promissory note and a $10 million equity line financing agreement.

96.     The headline for the $10 million financing agreement read, "Investment Agreement and Registration Rights Agreement."  UPPR stated that under the agreement, it was "required to file a registration statement … and to make any required filings under applicable state securities laws to register the shares" to be purchased under the agreement.  According to UPPR, however, it was only required to use its "best efforts" to file the Registration Statement.

97.     These statements were false and misleading.  In reality, the $10 million financing agreement was expressly conditioned on UPPR filing the registration statement, not merely using its best efforts.  UPPR would not receive any of that financing unless and until the registration statement was filed with the SEC and UPPR's stock was uplisted to QTCQB on OTC Link.  Neither of these conditions were satisfied, either before or after this submission.

98.     This information was material.  A reasonable investor would consider it important to making his or her investment decision to know that the financial condition of the company was weaker than publicly stated.

**F.     Reagh, Clayton and Others Dump Their UPPR Shares**

99.     UPPR's stock price and trading volume increased substantially during the touting and promotional campaign, and at or around this time Reagh and Clayton executed the third part of the scheme – selling the UPPR shares they owned and controlled for a substantial profit.  During the promotional campaign, which lasted from in or about January 2019 through June 27, 2019, UPPR's stock price increased

388% from $0.44 to $2.15 per share, and average daily trading volume increased 243% from 16,000 to 54,900 shares.

100.   On or about October 13, 2018, UPPR signed a merger agreement with GSHC.  Subsequently, between on or about October 17, 2018 and May 22, 2019, Reagh sold, and caused others to sell, approximately 467,835 of the UPPR shares he controlled in the F.A. Ventures account at Broker A and received proceeds of approximately $228,000.

101.   Between on or about February 27, 2019 and June 28, 2019, Reagh and Clayton sold approximately 2,100,134 of the UPPR shares they jointly controlled in the Natal account at Broker A and received proceeds of approximately $758,000.

102.   Between on or about July 16, 2018 and June 18, 2019, Reagh directed the trading of UPPR shares by R.R., an acquaintance of his.  Through the directed purchases and sales, including sales of UPPR shares that R.R. had purchased on the open market before the promotional campaign began, R.R. received proceeds of approximately $123,000 for the UPPR shares he sold.

103.   Reagh's coordination with R.R. in the sale of R.R.'s UPPR shares is corroborated by the fact that on or about June 20, 2019, R.R. transferred all of the proceeds he received from the sale of his UPPR shares to Chieftan Investments, an overseas account Reagh owned and controlled.

104.   Moreover, below is a chart showing that on the days R.R. executed several of the trades, R.R. was in contact with Reagh at or around the time of those trades:

| Date | Shares sold | Account | Amount | Texts | Calls |
|---|---|---|---|---|---|
| 3/22/2019 | 81,663 | R.R. | $45,457.86 | 37 | 11 |
| 5/13/2019 | 39,800 | R.R. | $24,254.88 | 39 | 12 |
| 5/16/2019 | 26,000 | R.R. | $17,052.78 | 29 | 13 |
| 5/17/2019 | 39,400 | R.R. | $30,881.47 | 45 | 23 |

| Date | Shares sold | Account | Amount | Texts | Calls |
|------|-------------|---------|--------|-------|-------|
| 5/28/2019 | 15,000 | R.R. | $12,725.58 | 10 | 9 |
| 5/31/2019 | 45,400 | R.R. | $35,288.45 | 23 | 8 |
| 6/7/2019 | 71,916 | R.R. | $69,728.48 | 3 | 6 |
| 6/10/2019 | 19,600 | R.R. | $22,715.88 | 43 | 8 |
| 6/17/2019 | 21,470 | R.R. | $29,196.58 | 39 | 8 |
| 6/18/2019 | 4,936 | R.R. | $8,630.28 | 4 | 1 |

### G.    The SEC Temporarily Suspends Trading in UPPR Stock

105.    On or about June 27, 2019, the SEC issued an order (Exchange Act Rel. No. 34-86228 (Jun. 27, 2019)) temporarily suspending trading in UPPR's stock.

106.    The SEC issued the suspension in the public's interest and for the protection of investors, noting that questions had arisen regarding the accuracy and adequacy of information in the marketplace about UPPR.  Specifically, its public statements concerning the $10 million worth of financing for UPPR, it denying the fact that it had retained an investor relations firm while it appeared there was promotional activity taking place on behalf of UPPR and UPPR's inadequate statements concerning a private offering of UPPR's common stock.  The SEC suspended trading in UPPR's stock from June 28, 2019 through July 12, 2019.

### H.    Defendants' Scienter and Negligence

107.    Earle, UPPR, Reagh, Clayton, and Dudley each acted intentionally, or at a minimum recklessly and negligently, in carrying out the fraudulent and deceptive acts in furtherance of the scheme, including in making the false and misleading statements in furtherance of the scheme.  Below are examples of their respective intentional and/or reckless state of mind and negligent course of conduct.

### 1.    Earle's and UPPR's Scienter and Negligence Regarding the OTC Filings and the Promotional Campaign

108.    Earle, whose mental state is imputed to UPPR, knew, or was reckless in

not knowing, that the statements he made in UPPR's annual and quarterly OTC submissions regarding the Issuance History and the $10 million in financing were materially false and misleading.  Further, at a minimum, Earle acted negligently; that is, he failed to act as a reasonable person would under the circumstances when making these statements.

109.   With respect to the Issuance History, Earle hired Bryant and Project Growth to assist him with the private offering and signed the subscription agreements that issued additional shares of UPPR to investors.  In addition, Earle admitted to Individual A – and therefore knew – that approximately 41 small investors had purchased an average of $20,000 worth of UPPR stock that he did not report to the transfer agent.

110.   With respect to the $10 million in financing, Earle reviewed and signed the convertible promissory note that set forth the terms under which UPPR would receive this financing.  The promissory note expressly conditioned the $10 million in financing on UPPR filing the registration statement and on its stock being uplisted to QTCQB on OTC Link.

111.   Earle was the maker of both these statements because he was the chief executive officer and control person of UPPR, and the person who signed and uploaded the OTC Markets Group submissions on behalf of UPPR.

112.   Earle also knew, or was reckless in not knowing, he had organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume.  Further, at a minimum, Earle acted negligently; that is, he failed to act as a reasonable person would under the circumstances when organizing and deploying the promotional campaign.

113.   Earle, through UPPR, hired Venado Media to oversee the campaign. Earle told Individual A he was personally involved in the campaign and had "a whole litany of press releases ready to go" that were "all positive" and "good news" about UPPR.  Earle admitted he was spending "5 grand a week" on a Facebook promotional

campaign and said that was "really getting the volume up."  Earle reviewed and edited the third research report before and after Venado Media disseminated it to the public.  The third research report served as a template for the subsequent reports.

114.   However, despite Earle knowing the truth, the research reports did not disclose that UPPR and Reagh had paid Dudley and Venado Media approximately $136,000 to write those reports.  Instead, the reports falsely and misleadingly stated that the compensation for those reports came from "Venado Media, LLC."

## 2.   Reagh's Scienter and Negligence Regarding the DSR Submissions to Broker A and the Promotional Campaign

115.   Reagh knew, or was reckless in not knowing, that he facilitated the submission of the false and misleading DSR on behalf of Natal.  Further, at a minimum, Reagh acted negligently; that is, he failed to act as a reasonable person would under the circumstances when facilitating the submission of the DSR to Broker A.

116.   Reagh admitted during a recorded telephone conversation with Individual A that the one million shares Natal deposited at Broker A were under his control.  Reagh demonstrated this, in part, by agreeing to give Individual A the sign-in codes (or password) for the Natal brokerage account so that Reagh could "coordinate" the selling of the UPPR shares in the account.  Reagh also admitted to Individual A that he facilitated the paperwork necessary for depositing the shares with Broker A.

117.   Reagh knew, or was reckless in not knowing, that he organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume.  Further, at a minimum, Reagh acted negligently; that is, he failed to act as a reasonable person would under the circumstances when he organized and deployed the touting and promotional campaign.

118.   Reagh reviewed the proposed promotional campaign and budget submitted by Venado Media and paid a portion of the fees charged by Venado Media

for the promotional campaign.

119.    Reagh also coordinated the sales (or dumping) of UPPR shares to the public, before, during and after the promotional campaign, as evidenced by the telephone and bank records outlined above.  These records show that Reagh spoke with Clayton and R.R. around the time they each sold shares of UPPR stock and later received a significant portion of the proceeds generated from the sales of those shares.

### 3.    Clayton's Scienter and Negligence Regarding the DSR Submissions to Broker A

120.    Clayton knew, or was reckless in not knowing, that he facilitated the submission of the false and misleading DSR on behalf of Natal.  Further, at a minimum, Clayton acted negligently; that is, he failed to act as a reasonable person would under the circumstances when facilitating the submission of the DSR to Broker A.

121.    Clayton signed and submitted – and never updated – the DSR claiming that the UPPR shares were solely owned by Natal and that no other person(s) or entity(s) had any claim or right to ownership of the shares or any portion of the sales proceeds.  Clayton knew, or was reckless and negligent in not knowing, that Reagh controlled the account, in part, because Clayton was in contact with Reagh during the DSR process, including when Broker A had questions.

122.    Clayton also knew, or was reckless and negligent in not knowing, he did not have sole authority to control the trading out of the Natal account, because he typically communicated with Reagh before and after the trades that Clayton placed. Telephone, brokerage and bank records show that Clayton contacted Reagh around the time he sold most, if not all, of the shares of UPPR stock and then transferred a significant portion of the proceeds generated from the sale of those shares to Reagh. Furthermore, Earle and Reagh both admitted that Reagh was the actual beneficial owner of the UPPR shares and that Clayton merely took instructions from Reagh.

### 4.      Dudley's Scienter and Negligence Regarding the Promotional Campaign

123.    Dudley intentionally, or at a minimum recklessly and negligently, organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume.  Dudley came up with the proposed promotional campaign and the budget for that campaign.  Dudley made, and caused others to make, false and misleading statements in the research reports that Venado Media disseminated to the public.  The research reports falsely claimed that the compensation for the reports came from "Venado Media, LLC" when Dudley knew, or was reckless in not knowing, that UPPR and Reagh had paid Dudley and Venado Media approximately $136,000 to write those reports about the company.  Further, at a minimum, Dudley acted negligently; that is, he failed to act as a reasonable person would under the circumstances when making false and misleading statements in Venado Media's research reports.

124.    Dudley was the maker of these false and misleading statements because he was the managing member and control person of Venado Media, and the person who reviewed and approved the research reports that were disseminated to the public through TheOTCReporter.com and DiscoveryStocks.com.

### FIRST CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5**

**(against Defendants Earle, UPPR, Clayton and Dudley)**

125.    The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

126.    Defendants Earle, UPPR, Clayton and Dudley engaged in fraudulent and deceptive conduct in furtherance of a scheme to defraud investors, including making materially false and misleading statements.  Earle, UPPR, Clayton and Dudley each took steps designed to artificially inflate UPPR's stock price and allow others to sell

their UPPR stock for a substantial profit (*i.e.,* a pump and dump) through false and misleading statements in UPPR's promotional campaign.  Earle and UPPR made false and misleading statements in OTC submissions.  Clayton made false and misleading statements in the DSR forms submitted to Broker A on behalf of Natal. Dudley made false and misleading statements in research reports his company wrote about UPPR and disseminated them to the public.

127.   By engaging in the conduct described above, Defendant Earle, UPPR, Clayton and Dudley, and each of them, directly or indirectly, in connection with the purchase or sale of a security, by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; (b) made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

128.   By engaging in the conduct described above, Defendants Earle, UPPR, Clayton and Dudley have violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a), 10b-5(b), and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a), 240.10b-5(b) & 240.10b-5(c).

## SECOND CLAIM FOR RELIEF

**Fraud in Connection with the Purchase or Sale of Securities**

**Violations of Section 10(b) of the Exchange Act and Rules 10b-5(a) and (c)**

**(against Defendant Reagh)**

129.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

130.   Defendant Reagh engaged in fraudulent and deceptive conduct in furtherance of a scheme to artificially inflate UPPR's stock price and allow Reagh

and others acting at his behest to sell their UPPR stock for a substantial profit (*i.e.*, a pump and dump): (i) he facilitated the submission of false and misleading DSRs to Broker A on behalf of Natal and F.A. Ventures; (ii) organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume; and (iii) coordinated the sales (or dumping) of the UPPR shares that he owned and controlled both during and after the promotional campaign.

131.   By engaging in the conduct described above, Defendant Reagh, directly or indirectly, in connection with the purchase or sale of a security, and by the use of means or instrumentalities of interstate commerce, of the mails, or of the facilities of a national securities exchange: (a) employed devices, schemes, or artifices to defraud; and (b) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

132.   By engaging in the conduct described above, Defendant Reagh has violated, and unless restrained and enjoined will continue to violate, Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rules 10b-5(a) and 10b-5(c) thereunder, 17 C.F.R. §§ 240.10b-5(a) & 240.10b-5(c).

## THIRD CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Section 17(a) of the Securities Act

### (against Defendants Earle, Clayton and Reagh)

133.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

134.   Defendants Earle, Clayton and Reagh engaged in fraudulent and deceptive conduct in furtherance of a scheme to defraud investors and obtained money by means of false and misleading statements. Earle, Clayton and Reagh each took steps designed to artificially inflate UPPR's stock price and allow themselves and others to sell their UPPR stock for a substantial profit (*i.e.,* a pump and dump). Earle made false and misleading statements in OTC submissions; Clayton made false

and misleading statements in the DSR forms submitted to Broker A on behalf of Natal, which Reagh facilitated; Earle and Reagh organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume; and Reagh coordinated the sales (or dumping) of the UPPR shares that he owned and controlled both during and after the promotional campaign.

135.   By engaging in the conduct described above, Defendants Earle, Clayton and Reagh, and each of them, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; (b) obtained money or property by means of untrue statements of a material fact or by omitting to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

136.   By engaging in the conduct described above, Defendants Earle, Clayton and Reagh have violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1), 17(a)(2), and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1), 77q(a)(2), & 77q(a)(3).

## FOURTH CLAIM FOR RELIEF

### Fraud in the Offer or Sale of Securities

### Violations of Sections 17(a)(1) and (3) of the Securities Act

### (against Defendant UPPR)

137.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

138.   Defendant UPPR, whose conduct is imputed to it through Earle, engaged in fraudulent and deceptive conduct in furtherance of a scheme to defraud investors. UPPR took steps designed to artificially inflate UPPR's stock price and allow themselves and others to sell their UPPR stock for a substantial profit (*i.e.,* a pump

and dump).  UPPR submitted false and misleading materials to OTC Markets, and organized and deployed the touting and promotional campaign designed to drive up UPPR's stock price and trading volume, and allow others to sell their UPPR stock for a substantial profit (*i.e.,* a pump and dump).

139.   By engaging in the conduct described above, Defendant UPPR, directly or indirectly, in the offer or sale of securities, and by the use of means or instruments of transportation or communication in interstate commerce or by use of the mails directly or indirectly:  (a) employed devices, schemes, or artifices to defraud; and (b) engaged in transactions, practices, or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

140.   By engaging in the conduct described above, Defendant UPPR violated, and unless restrained and enjoined will continue to violate, Sections 17(a)(1) and 17(a)(3) of the Securities Act, 15 U.S.C. §§ 77q(a)(1) & 77q(a)(3).

## FIFTH CLAIM FOR RELIEF

### Unregistered Offer and Sale of Securities

### Violations of Sections 5(a) and 5(c) of the Securities Act

### (against Defendants Earle, UPPR, Bryant and Project Growth )

141.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

142.   Defendants Earle, UPPR, Bryant and Project Growth participated in an offering of UPPR's stock that was never registered with the SEC, and no exemptions from the registration requirement applied to the offering.

143.   By engaging in the conduct described above, Defendants Earle, UPPR, Bryant and Project Growth, and each of them, directly or indirectly, singly and in concert with others, has made use of the means or instruments of transportation or communication in interstate commerce, or of the mails, to offer to sell or to sell securities, or carried or caused to be carried through the mails or in interstate commerce, by means or instruments of transportation, securities for the purpose of

1    sale or for delivery after sale, when no registration statement had been filed or was in

2    effect as to such securities, and when no exemption from registration was applicable.

3        144.   By engaging in the conduct described above, Defendants Earle, UPPR,

4    Bryant and Project Growth have violated, and unless restrained and enjoined, are

5    reasonably likely to continue to violate, Sections 5(a) and 5(c), 15 U.S.C. §§ 77e(a) &

6    77e(c).

7                        **SIXTH CLAIM FOR RELIEF**

8                        **Unregistered Broker-Dealer**

9              **Violation of Section 15(a) of the Exchange Act**

10            **(against Defendants Bryant and Project Growth)**

11       145.   The SEC realleges and incorporates by reference paragraphs 1 through

12    124 above.

13       146.   Defendants Bryant and Project Growth each acted as unregistered

14    brokers by, among other things, offering and agreeing to provide broker-dealer

15    services in exchange for transaction-based compensation, including a percentage of

16    funds raised, without being registered with the SEC.

17       147.   By engaging in the conduct described above, Defendants Bryant and

18    Project Growth, and each of them, made use of the mails and means or

19    instrumentalities of interstate commerce to effect transactions in, and induced and

20    attempted to induce the purchase or sale of, securities (other than exempted securities

21    or commercial paper, bankers' acceptances, or commercial bills) without being

22    registered with the SEC in accordance with Section 15(b) of the Exchange Act, 15

23    U.S.C. § 78o(b), and without complying with any exemptions promulgated pursuant

24    to Section 15(a)(2), 15 U.S.C. § 78o(a)(2).

25       148.   By engaging in the conduct described above, Defendants Bryant and

26    Project Growth have violated, and unless restrained and enjoined, are reasonably

27    likely to continue to violate, Section 15(a) of the Exchange Act, 15 U.S.C. § 78o(a).

28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## SEVENTH CLAIM FOR RELIEF

### Anti-Touting

### Violation of Section 17(b) of the Securities Act

### (against Defendant Dudley)

149.   The SEC realleges and incorporates by reference paragraphs 1 through 124 above.

150.   Defendant Dudley violated the anti-touting provisions by failing to fully disclose the source, type, and amount of the compensation he received, and was to receive, from UPPR and Reagh in exchange for promoting UPPR's stock through press releases, social media, banners on financial websites, and research reports about the company.

151.   By engaging in the conduct described above, Defendant Dudley, by the use of any means or instruments or transportation or communication in interstate commerce or by use of the mails, published, gave publicity to, or circulated any notice, circular, advertisement, newspaper, article, letter, investment services, or communication which, though not purporting to offer a security for sale, described such security for a consideration received or to be received, directly or indirectly, from an issuer, underwriter, or dealer, without fully disclosing the receipt, whether part or perspective, of such consideration and the amount thereof.

152.   By reason of the foregoing, Dudley has violated, and unless restrained and enjoined, is reasonably likely to continue to violate, Section 17(b) of the Securities Act, 15 U.S.C. § 77q(b).

## PRAYER FOR RELIEF

WHEREFORE, the SEC respectfully requests that the Court:

### I.

Issue findings of fact and conclusions of law that Defendants committed the alleged violations.

3:22-cv-1914-H-MDD

## II.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Earle, UPPR, Reagh, and Clayton, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## III.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Earle, UPPR, Bryant and Project Growth, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a), 77e(c)].

## IV.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendants Bryant and Project Growth, and their officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal service or otherwise, and each of them, from violating Section 15(a) of the Exchange Act [15 U.S.C. § 78o(a)].

## V.

Issue judgments, in forms consistent with Rule 65(d) of the Federal Rules of Civil Procedure, permanently enjoining Defendant Dudley, and his officers, agents, servants, employees and attorneys, and those persons in active concert or participation with any of them, who receive actual notice of the judgment by personal

3:22-cv-1914-H-MDD

service or otherwise, and each of them, from violating Section 17(b) of the Securities Act [15 U.S.C. § 77q(b)], and Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

**VI.**

Order Defendants to disgorge all funds received from their illegal conduct, together with prejudgment interest thereon pursuant to Sections 21(d)(5) and 21(d)(7) of the Exchange Act [15 U.S.C. §§ 78u(d)(5) and 78u(d)(7)].

**VII.**

Order Defendants to pay civil penalties under Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)].

**VIII.**

Enter orders against Defendants Earle, Reagh, Clayton, and Dudley, pursuant to Sections 20(e) and 20(g) of the Securities Act, 15 U.S.C. § 77t(e), (g), and Sections 2l(d)(2) and 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(2), (6), prohibiting each of them from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act, 15 U.S.C. § 78l or that is required to file reports pursuant to Section 15(d) of the Exchange Act, 15 U.S.C. § 78o(d)

**IX.**

Enter orders against Defendants Earle, Reagh, Clayton, and Dudley, prohibiting each of them from participating in an offering of penny stock pursuant to Section 20(g) of the Securities Act, 15 U.S.C. § 77t(g), and Section 21(d)(6) of the Exchange Act, 15 U.S.C. § 78u(d)(6).

**X.**

Retain jurisdiction of this action in accordance with the principles of equity and the Federal Rules of Civil Procedure in order to implement and carry out the terms of all orders and decrees that may be entered, or to entertain any suitable application or

motion for additional relief within the jurisdiction of this Court.

**XI.**

Grant such other and further relief as this Court may determine to be just and necessary.

Dated:  April 24, 2023

/s/ Douglas M. Miller
DOUGLAS M. MILLER
Attorney for Plaintiff
Securities and Exchange Commission

3:22-cv-1914-H-MDD