# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                                     Plaintiff,<br><br>v.<br><br>JOSEPH R. EARLE, JR., BARRY D. REAGH, WILLIAM CLAYTON, FRANCIS T. DUDLEY, STEVEN E. BRYANT, UPPER STREET MARKETING, INC. and PROJECT GROWTH INTERNATIONAL, INC.,<br><br>                                     Defendants. | Case No.: 3:22-cv-01914-H-SBC<br><br>**ORDER GRANTING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT**<br><br>[Doc. No. 105] |

On June 27, 2024, Plaintiff Securities and Exchange Commission ("SEC") filed a motion for partial summary judgment against Defendants Joseph R. Earle, Jr. ("Earle") and *pro se* Steven E. Bryant ("Bryant"). (Doc. No. 105.) On July 15, 2024, Defendant Earle filed a response in opposition to the SEC's motion. (Doc. No. 111.) Defendant Earle also

filed a request for rulings on evidentiary objections.[1]  (Doc. No. 111-1.)  On July 22, 2024, Plaintiff SEC filed a reply to Defendant Earle's opposition.  (Doc. No. 118.)

The Court granted two requests from Defendant Bryant for extensions of time to respond to Plaintiff SEC's motion.  (Doc. Nos. 125, 127.)  The Court also notified Defendant Bryant that if he failed to respond, the Court reserved the right to proceed with the hearing.  (See Doc. Nos. 125, 127, 129.)  The Court further notified Defendant Bryant that if he failed to respond, it would treat Defendant Earle's opposition as Defendant Bryant's opposition to the extent the opposition is applicable to him.  (See Doc. No. 125.)  To date, Defendant Bryant has not filed any response to the motion, nor has he requested a third extension of time to file a response.

The Court held a hearing on the matter on September 30, 2024.  Charles E. Canter appeared for Plaintiff SEC.  Andrew B. Holmes appeared for Defendant Earle.  Despite being notified about the hearing, Defendant Bryant did not appear.  Also present were Randolf Warner Katz for Defendant Upper Street Marketing, Inc. ("UPPR") and James D. Sallah for Defendant Francis T. Dudley.  For the reasons below, the Court grants Plaintiff SEC's motion for partial summary judgment.

## Background

In the spring of 2018, Defendant Earle became the chief financial officer of Growing Springs, LLC, a company that sold liquid conversion technology to cannabis and hemp growers to help them achieve higher crop yields.  (Second Amended Complaint ("SAC") ¶ 26; Doc. No. 64, Earle's Answer ¶ 26.)  Growing Springs, LLC was eventually rolled

---

[1]  The Court does not rely on or reference any of the statements to which Defendant Earle objected in reaching its rulings set forth below.  Thus, because the statements are not material to the Court's rulings, the Court need not rule on Defendant Earle's evidentiary objections.  See Elena v. Reliance Standard Life Ins. Co., 2022 WL 1174107, at *8 (S.D. Cal. Apr. 20, 2022) ("A court need not rule on evidentiary objections that are not material to its ruling."); see, e.g., Williams v. Cnty. of San Diego, 523 F. Supp. 3d 1183, 1193-94 (S.D. Cal. 2021) (declining to rule on evidentiary objections that were not material to the district court's ruling); F.T.C. v. John Beck Amazing Profits, LLC, 865 F. Supp. 2d 1052, 1062 (C.D. Cal. 2012) ("The Court need not address these objections because the Court did not rely on any portion of the evidence to which Defendants objected.").

into Growing Springs Holdings Corporation, of which Defendant Earle became chief executive officer and sole owner. (Doc. No. 105-5, Ex. B, Deposition of Earle from March 25, 2024 ("Earle Depo.") at 15:22-16:15.) In the summer of 2018, Defendant Earle sought a dormant public company to serve as a vehicle for raising capital for Growing Springs. (Doc. No. 105-5, Ex. B, Earle Depo. at 14:14-22, 15:1-12, 16:18-21; Doc. No. 105-4, Ex. A, SEC Investigative Testimony of Earle from February 10, 2021 ("Earle Test.") at 28:7-11, 29:9-25.) Defendant Earle was introduced to Gordon McDougall, who was then a director of Defendant UPPR, an Oklahoma corporation which had shares that traded publicly under the trading symbol "UPPR." (Doc. No. 105-5, Ex. B, Earle Depo. at 16:18-17:4; Doc. No. 105-7, Ex. D at 1-3.) Defendant Earle and McDougall ultimately reached an agreement, and in the fall of 2018, Defendant Earle acquired 35 million shares of UPPR. (Doc. No. 105-5, Ex. B, Earle Depo. at 14:21-15:3; Doc. No. 105-7, Ex. D at 9.) Defendant Earle became the majority shareholder and chief executive officer of UPPR. (SAC ¶ 12; Doc. No. 64, Earle's Answer ¶ 12; Doc. No. 105-7, Ex. D at 3, 9.)

After Defendant Earle acquired control of UPPR, starting in the fall of 2018, UPPR began an offering of unregistered securities at Defendant Earle's direction. (Doc. No. 105-5, Ex. B, Earle Depo. at 49:2-17.) To find potential investors, Defendant Earle contracted with Defendant Project Growth International, Inc. ("Project Growth"), which Defendant Bryant formed in August 2018 to provide services to cannabis-related companies. (Doc. No. 105-5, Ex. B, 48:13-49:1; Doc. No. 105-8, Ex. E, SEC Investigative Testimony of Bryant from January 16, 2020 ("Bryant Test.") at 28:15-29:2.) In September 2018, Defendants Earle and Bryant agreed that Project Growth would, among other things, "identify capital sources to assist Growing Springs in procuring financing to advance its business expansion." (Doc. No. 105-9, Ex. F at 3.) Per their agreement, Project Growth was "entitled to compensation as the finder" for investments by investors that Project Growth "supplied to [Growing Springs] or its affiliates[.]" (Id.) Specifically, Growing Springs would pay Project Growth a "total consulting fee" of 10 percent plus 3 percent for non-accountable expenses. (Id.; Doc. No. 105-10, Ex. G, Deposition of Bryant from

February 20, 2024 ("Bryant Depo.") at 25:2-19, 26:21-27:25.)  In December 2018, Defendants Earle and Bryant entered into a revised agreement that provided for the 10 percent consulting fee and 3 percent for non-accountable expenses, plus the payment of additional expenses to Project Growth.  (Doc. No. 105-11, Ex. H at 2-3.)  Under both agreements, Project Growth's compensation was based on the amounts invested by the investors Project Growth referred to UPPR.  (Doc. No. 105-9, Ex. F at 3-4; Doc. No. 105-11, Ex. H at 2-3; Doc. No. 105-10, Ex. G, Bryant Depo. at 88:23-89:7, 90:1-5.)

Project Growth identified potential investors using lead lists purchased from lead vendors and using a list of about 7,000 to 8,000 leads Defendant Bryant had already. (Doc. No. 105-8, Ex. E, Bryant Test. at 88:9-89:20; Doc. No. 105-10, Ex. G, Bryant Depo. at 32:5-33:21.)  Th lead lists Project Growth purchased typically contained "hundreds, perhaps a thousand" names.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 44:5-8.)  Defendant Bryant hired, trained, and supervised the Project Growth employees who cold-called names on the lists.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 43:2-17; Doc. No. 105-14, Ex. K, SEC Investigative Testimony of Paul Cohen from November 10, 2022 ("Cohen Test.") at 29:6-16, 30:23-31:15.)  Using a checklist and information sheet that Defendant Bryant prepared, the employees "qualified" the potential investors as accredited investors and assessed their interest in investing in a cannabis company.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 37:25-38:8, 43:2-17, 52:22-53:1, 59:12-15; Doc. No. 105-13, Ex. J, SEC Investigative Testimony of Joshua Johnson from November 17, 2022 ("Johnson Test.") at 28:6-30:15; Doc. No. 105-14, Ex. K, Cohen Test. at 29:6-21, 30:23-31:24, 32:18-33:14; Doc. No. 105-15, Ex. L.)

To "qualify" the prospective investors, Project Growth employees asked potential investors if they were accredited and explained the meaning of an "accredited investor" if the potential investor was unsure.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 36:5-7, 37:9-16; Doc. No. 105-13, Ex. J, Johnson Test. at 29:12-30:13; Doc. No. 105-14, Ex. K, Cohen Test. at 33:21-25.)  Project Growth employees did not take any further steps to independently verify investors' accredited status.  (Doc. No. 105-10, Ex. G, Bryant Depo.

1  at 36:5-7, 37:25-38:8, 52:22-53:1; Doc. No. 105-13, Ex. J, Johnson Test. at 29:12-30:13.)
2  If Project Growth "qualified" a potential investor as accredited and if the potential investor
3  expressed an interest in investing in UPPR, Project Growth would email them promotional
4  materials including information provided by Defendant Earle.  (Doc. No. 105-10, Ex. G,
5  Bryant Depo. at 42:4-23, 46:1-8, 59:12-15, 60:8-16; Doc. No. 105-14, Ex. K, Cohen Test.
6  at 48:16-49:11; Doc No. 105-16, Ex. M.)  Defendant Bryant or one of his associates would
7  then follow up with the potential investor by telephone to answer any questions the
8  potential investor may have had.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 59:12-60:6.)

9       If a potential investor wanted to invest in UPPR, Project Growth sent them a
10 "Referral Reservation of Shares" ("Referral Reservation"), which listed the investor's
11 name, the quantity of shares the investor had indicated the desire to purchase, the price of
12 each share, and the cost of the total transaction.  (See Doc. No. 105-17, Ex. N.)  The
13 Referral Reservation listed wire instructions for UPPR's bank account and instructed the
14 investor to wire their total investment by a specified date.  (Id.)  It also instructed the
15 investor to email their subscription agreement to Defendant Earle's email address.  (Id.)
16 On multiple occasions, Defendant Bryant or another Project Growth employee emailed
17 potential investors the Referral Reservation along with the UPPR subscription agreement.
18 (See Doc. No. 105-18, Ex. O; Doc. No. 105-19, Ex. P; Doc. No. 105-20, Ex. Q.)  When an
19 investor emailed or faxed their executed subscription agreement to Project Growth,
20 Defendant Bryant would forward it to Defendant Earle.  (See Doc. No. 105-21, Ex. R; Doc.
21 No. 105-22, Ex. S; Doc. No. 105-23, Ex. T.)

22       Defendant Earle accepted and signed subscription agreements on behalf of UPPR.
23 (Doc. No. 105-5, Ex. B, Earle Depo. at 52:7-10; see, e.g., Doc. No. 105-25, Ex. V.)
24 Defendant Earle initially relied on Project Growth's "qualification" of investors' accredited
25 status and later in the offering on a signed attestation of accredited status that Defendant
26 Earle had asked Defendant Bryant to give potential investors.  (Doc. No. 105-5, Ex. B,
27 Earle Depo. at 52:11-54:16; Doc. No. 105-26, Ex. W.)  Defendant Earle did not review
28 investors' W-2s, Form 1099s, bank statements, third-party appraisals, or consumer reports

from any nationwide consumer reporting agencies to verify investors' accredited status. (Doc. No. 105-5, Ex. B, Earle Depo. at 54:17-55:8.)

Overall, about $5,000,000 was raised in the UPPR offering. (Doc. No. 105-5, Ex. B, Earle Depo. at 86:21-87:1; see also Doc. No. 105-27; Ex. X.) Investors in the offering included those referred by Project Growth, and UPPR compensated Project Growth for those referrals. (Doc. No. 105-5, Ex. B, Earle Depo. at 48:13-20; Doc No. 105-10, Ex. G, Bryant Depo. at 88:23-89:7.) Defendants Earle and Bryant kept records of the amounts those referrals invested and the corresponding fees UPPR owed Project Growth. (See Doc. No. 105-28, Ex. Y; Doc. No. 105-29, Ex. Z.) Defendant Bryant was not registered as a broker-dealer during the UPPR offering. (Doc No. 105-10, Ex. G, Bryant Depo. at 25:20-23, 28:1-5.)

Plaintiff SEC's Second Amended Complaint, filed on April 24, 2023, alleges that Defendants Earle and Bryant participated in the unregistered offer and sale of securities in violation of Sections 5(a) and 5(c) of the Securities Act of 1933 (the "Securities Act"), 15 U.S.C. § 77e(a), (c). SAC ¶¶ 141-144. Plaintiff SEC further alleges that Defendant Bryant acted as an unregistered broker in violation of Section 15(a) of the Securities Exchange Act of 1934 (the "Exchange Act"), 15 U.S.C. § 78o(a). SAC ¶¶ 145-148. By present motion, Plaintiff SEC moves for summary judgment of its fifth claim in the SAC as asserted against Defendants Earle and Bryant and of its sixth claim in the SAC as asserted against Defendant Bryant. (Doc. No. 105.)

**Discussion**

**I.      Legal Standards for a Motion for Summary Judgment**

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates that there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Mgmt.,

Inc., 618 F.3d 1025, 1031 (9th Cir. 2010). "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Fortune Dynamic, 618 F.3d at 1031 (internal quotation marks and citations omitted); accord Anderson, 477 U.S. at 248. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case that the nonmoving party bears the burden of proving at trial. Id. at 322-23; Jones v. Williams, 791 F.3d 1023, 1030 (9th Cir. 2015). Once the moving party establishes the absence of a genuine issue of material fact, the burden shifts to the nonmoving party to "set forth, by affidavit or as otherwise provided in Rule 56, 'specific facts showing that there is a genuine issue for trial.'" T.W. Elec. Serv., 809 F.2d at 630 (quoting former Fed. R. Civ. P. 56(e)); accord Horphag Research Ltd. v. Garcia, 475 F.3d 1029, 1035 (9th Cir. 2007). To carry this burden, the non-moving party "may not rest upon mere allegation or denials of his pleadings." Anderson, 477 U.S. at 256; see also Behrens v. Pelletier, 516 U.S. 299, 309 (1996) ("On summary judgment, . . . the plaintiff can no longer rest on the pleadings."). Rather, the nonmoving party "must present affirmative evidence . . . from which a jury might return a verdict in his favor." Anderson, 477 U.S. at 256.

When ruling on a summary judgment motion, the court must view the facts and draw all reasonable inferences in the light most favorable to the non-moving party. Scott v. Harris, 550 U.S. 372, 378 (2007). The court should not weigh the evidence or make credibility determinations. See Anderson, 477 U.S. at 255. "The evidence of the non-movant is to be believed." Id. Further, the Court may consider other materials in the record

not cited to by the parties, but it is not required to do so.  See Fed. R. Civ. P. 56(c)(3); Simmons v. Navajo Cnty., 609 F.3d 1011, 1017 (9th Cir. 2010).

## II. Analysis

### A. Plaintiff SEC's Claims Under Sections 5(a) and 5(c) of the Securities Act

Sections 5(a) and 5(c) of the Securities Act of 1933 make it unlawful to "make use of any means or instruments of transportation or communication in interstate commerce or of the mails" to offer, sell, or deliver an unregistered security.  15 U.S.C. § 77e(a), (c); see also SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1085 (9th Cir. 2010).  To establish a prima facie case that a defendant violated Section 5, the SEC must show that "(1) no registration statement was in effect as to the securities; (2) the defendant directly or indirectly sold or offered to sell securities; and (3) the sale or offer was made through interstate commerce."  SEC v. CMKM Diamonds, Inc., 729 F.3d 1248, 1255 (9th Cir. 2013).  If the SEC raises a prima facie case of liability, the burden of proof shifts to the defendant to show that he is entitled to an exemption.  Id.

#### 1. Plaintiff SEC Has Established its Prima Facie Case

Plaintiff SEC has raised a prima facie case of liability here.  First, it is undisputed that the UPPR securities in question here were unregistered, as is stated explicitly on the subscription agreements used during the offering.  (Doc. No. 105-5, Ex. B, Earle Depo. at 49:2-8; Doc No. 105-25, Ex. V.)

Second, the undisputed facts show that both Defendants Earle and Bryant sold the unregistered securities.  As Plaintiff SEC notes, Defendant Earle directed the offering, accepted investors' subscription agreements, and signed subscription agreements on behalf of UPPR to complete the sale.  (Doc. No. 105-5, Ex. B, Earle Depo. at 49:2-17, 52:7-10; see, e.g., Doc. No. 105-25, Ex. V.)  Defendant Earle argues in his opposition that only one of the subscription agreements filed in support of the motion actually contains his signature and that "not all subscription agreements were signed by Earle." (Doc. No. 111 at 2; see Doc. No. 105-25, Ex. V.)  But as Plaintiff SEC notes, Defendant Earle does not dispute that he signed subscription agreements of investors referred by Project Growth, and

whether Defendant Earle signed each and every subscription agreement is immaterial to his liability.  For his part, Defendant Bryant hired, trained, and supervised a team at Project Growth to call potential investors, inform them of the UPPR offering, email them informational materials, provide subscription agreements and payment instructions.  (Doc. No. 105-10, Ex. G, Bryant Depo. at 42:4-23, 43:2-17, 46:1-8, 59:12-15, 60:8-16; Doc. No. 105-14, Ex. K, Cohen Test. at 29:6-16, 30:23-31:15, 48:16-49:11; Doc No. 105-16, Ex. M; Doc. No. 105-17, Ex. N; Doc. No. 105-18, Ex. O; Doc. No. 105-19, Ex. P; Doc. No. 105-20, Ex. Q.)  Defendant Bryant also personally forwarded referrals' subscriptions agreements to UPPR.  (See Doc. No. 105-21, Ex. R; Doc. No. 105-22, Ex. S; Doc. No. 105-23, Ex. T.)

Third, the UPPR securities were sold in interstate commerce to investors in multiple states (Doc. 105-20, Ex. G, Bryant Depo. at 61:3-14; see, e.g., Doc. No. 105-21, Ex. R at 7; Doc. No. 105-21, Ex. S at 5; Doc No. 105-25, Ex. V at 2) using instrumentalities of interstate commerce including telephones and the internet.  See United States v. Nader, 542 F.3d 713, 717 (9th Cir. 2008) ("Telephones are instrumentalities of interstate commerce . . . ."); United States v. Sutcliffe, 505 F.3d 944, 953 (9th Cir. 2007) (agreeing with Eighth Circuit's conclusion that "the Internet is an instrumentality and channel of interstate commerce").

For the reasons stated above, Plaintiff SEC has established a prima facie case that Defendants Earle and Bryant violated Sections 5(a) and 5(c) of the Securities Act, and Defendant Earle does not argue otherwise in his opposition.  Accordingly, the burden shifts to Defendants to show they are entitled to an exemption.

**2.    Defendants Have Not Proven the Applicability of an Exemption**

Defendant Earle argues in his opposition that the transactions at issue were exempt from registration under Rule 506(c) of Regulation D, 17 C.F.R. § 230.506.  Under Rule 506(c), issuers may broadly solicit and generally advertise an offering if two conditions are satisfied.  First, all purchasers of the securities must be "accredited investors."  17 C.F.R. § 230.506(c)(2)(i).  As applied to natural persons, "accredited investor" means any person

whose net worth excluding their primary residence exceeds $1,000,000; or who earned more than $200,000 in each of the previous two years or had joint income with a spouse of $300,000 in each of the previous two years, and who expects to earn the same in the current year. 17 C.F.R. § 230.501(a)(5)-(6). For the purposes of Regulation D, the term "accredited investor" also includes any person "who the issuer reasonably believes comes within" those categories at the time the securities were purchased. § 230.501(a).

The second condition required for the Rule 506(c) exemption is that the issuer must "take reasonable steps to verify that purchasers . . . are accredited investors." 17 C.F.R. § 230.506(c)(2)(ii). Such reasonable steps include but are not limited to reviewing the purchaser's W-2, Form 1099, or bank statements; reviewing a consumer report from a nationwide consumer reporting agency; and obtaining written confirmation from a registered broker that the broker has taken reasonable steps within the past three months to verify the purchaser's status. 17 C.F.R. § 230.506(c)(2)(ii)(A)-(C).

Defendant Earle argues that the transactions at issue here were exempt from registration under Rule 506(c) "because, among other things, he reasonably believed the investors had all been properly determined by Bryant and/or [Project Growth] to be 'accredited.'" (Doc. No. 111, Opp. at 8.) Defendant Earle argues this belief was reasonable because Project Growth warranted and represented that the investors were verified as accredited. (Id. at 8-9.) He also notes that Defendant Bryant himself and others who worked for Project Growth testified they believed the leads being used were all accredited investors. (Id. at 9-10.) He maintains that Defendant Bryant never told him he was responsible for verifying investors' status. (Id. at 10.) He further notes that the documents Project Growth sent to him reinforced his belief that Defendant Bryant or Project Growth had verified the investors' status, as many contained the language "Project Growth Intl, Inc. is referring you to Growing Springs Holdings Inc., as a qualified accredited investor." (Id. at 10-11.)

As stated above, the first condition that must be satisfied for the Rule 506(c) exemption to apply is that all purchasers must be "accredited investors." 17 C.F.R.

§ 230.501(a). For the purposes of the regulation, that term includes any person "who the issuer reasonably believes comes within" those categories at the time the securities were purchased. 17 C.F.R. § 230.501(a). Id. Accordingly, Defendant's Earle's arguments regarding the reasonableness of his belief that the investors' status was already verified may go to the issue of whether this first condition is satisfied. But as Plaintiff SEC notes, for the Rule 506(c) exemption to apply, the issuer must also "take reasonable steps to verify that purchasers . . . are accredited investors." 17 C.F.R. § 230.506(c)(2)(ii). There is no indication that any such steps were taken here. In his deposition, Defendant Earle stated that he did not review investors' W-2s, Form 1099s, bank statements, third-party appraisals, or consumer reports from any nationwide consumer reporting agencies to verify investors' accredited status. (Doc. No. 105-5, Ex. B, Earle Depo. at 54:17-55:8.) Nor did Defendant Bryant or others at Project Growth take any steps to independently verify investors' accredited status. (Doc. No. 105-10, Ex. G, Bryant Depo. at 36:5-7, 37:25-38:8, 52:22-53:1; Doc. No. 105-13, Ex. J, Johnson Test. at 29:12-30:13.) And while Defendant Earle correctly notes in his opposition that the examples of steps enumerated in § 230.506(c)(2)(ii) are "non-exclusive and non-mandatory," he does not clearly identify any other steps he affirmatively took to verify investors' accredited status. (Doc. No. 111, Opp. at 7.) Rather, as discussed above, he primarily argues that he reasonably relied on the investors' own representations and Project Growth to make sure the investors were accredited.

The question that follows from Defendant Earle's argument as summarized above is whether reliance on investors' own representations can itself demonstrate that an issuer took "reasonable steps" as required by § 230.506(c)(2)(ii). Courts in the Ninth Circuit applying the Rule 506(c) exemption have found that reliance on investors' own representations regarding their accredited status is not enough to show an issuer took reasonable steps to verify those representations. See SEC v. LFS Funding Ltd. P'ship, 2023 WL 6373859, at *5 (C.D. Cal. Aug. 25, 2023) (granting summary judgment for SEC on Section 5 claim after holding the Rule 506(c) exemption did not apply where issuer

merely relied on investors' own representations); SEC v. Punch TV Studios, Inc., at *1-2 (C.D. Cal. Sept. 6, 2023) (same); SEC v. Johnson, 2022 WL 423492, at *4 (C.D. Cal. Jan. 26, 2022) (same); Esebag v. Whaley, 2020 WL 7414734 (C.D. Cal. Sept. 8, 2020) (denying summary judgment for issuer after rejecting its argument that its reliance on investors' own representations was sufficient to meet the verification requirements of Rule 506(c)). Accordingly, Defendants' reliance on investors' own representations here does not itself show they took reasonable steps to verify the investors' accredited status.

Defendant Earle cites SEC v. Webb, 2019 WL 1454532 (N.D. Ill. Apr. 2, 2019), which reached a different result. In Webb, the issuer's subscription agreement contained language indicating that the securities being purchased were unregistered and sold in reliance on registration exemptions. Id. at *5. The court in that case held that based on the language in the subscription agreement, "though not as detailed as it could be," a reasonable juror could conclude that the issuer satisfied its verification obligation under Rule 506(c) by relying on the investors themselves to verify their status. Id. Accordingly, the court denied the SEC's motion for summary judgment. Id. at *5-6.

As Plaintiff SEC notes, the court's reasoning in Webb is inconsistent with the history of the "reasonable steps" requirement in § 230.506(c). Prior to 2012, § 230.506 contained no requirement that issuers take reasonable steps to verify prospective investors' accredited status. That requirement came with the 2012 enactment of the Jumpstart Our Business Startups ("JOBS") Act, which aimed to boost the economy by "improving access to the public capital markets for emerging growth companies." Jumpstart Our Business Startups Act, Pub. L. No. 112-106, 126 Stat. 306, 306 (2012). Among other things, the JOBS Act required the SEC to create a new registration exemption conditioned on all investors being accredited and the issuer taking "reasonable steps" to verify investors' accredited status, which the SEC promulgated as Rule 506(c) of Regulation D. JOBS Act § 201(a)(1), 126 Stat. at 313. See also Davis v. St. Anselm Exploration Co., 2015 WL 13651012, at *9-10 (D.N.M. Oct. 8, 2015) (discussing the history of § 230.506's "reasonable steps" requirement and noting that under the previous version of the regulation, issuers had "no

legal duty . . . to verify the accreditation status of an investor beyond [the investor's] self-certification.").

The holding in Webb is inconsistent with the history of § 230.506 and difficult to square with its plain language.  The verification obligation was implemented to depart from a status quo that permitted investors to self-certify their eligibility to purchase the offered securities, and thus, permitted the issuers to rely on that self-certification.  To hold that an issuer can verify investors' representations of their accredited status by relying on those very representations would defeat the purpose of the verification requirement.  See LFS Funding Ltd. P'ship, 2023 WL 6373859, at *5 ("[R]eliance on an investor's own representations is–by definition–not verification and is therefore insufficient as a matter of law.").  For that reason, the Court declines to follow Webb and instead follows the in-circuit cases cited by the parties.  Defendants' reliance on the investors' own representations that they were accredited, or on Project Growth documents stating that investors were being referred as qualified accredited investors, cannot alone show that Defendants took reasonable steps to verify that the purchasers were indeed accredited.

Defendant Earle also suggests that his reliance on Defendant Bryant and Project Growth to verify investors' accredited status was enough to meet the verification requirements of Rule 506(c).  While § 230.506(c)(2)(ii) contemplates that an issuer might satisfy its verification obligation by relying on someone else to verify investors' status, it specifies that in order to do so, the other person must be a registered broker-dealer, a registered investment adviser, a licensed attorney, or a certified public accountant.  17 C.F.R. § 230.506(c)(2)(ii)(C).  It further specifies that the issuer must obtain "written confirmation" that the person "has taken reasonable steps to verify that the purchaser is an accredited investor within the prior three months and has determined that such purchaser is an accredited investor[.]"  Id.  Defendant Earle met none of those requirements here, and has not otherwise convincingly explained how his belief that Defendant Bryant and Project Growth were verifying investors' status shows that he himself took reasonable steps to verify the investors were accredited.

In sum, Plaintiff SEC has established a prima facie case that Defendant Earle and Defendant Bryant violated Sections 5(a) and (c) of the Securities Act, and neither Defendant has established that an exemption to the registration requirement applies. Accordingly, Plaintiff SEC is entitled to summary judgment on its fifth claim in the SAC against Defendants Earle and Bryant.

### B.   Plaintiff SEC's Claim Under Section 15 of the Exchange Act

Under Section 15(a)(1) of the Securities Exchange Act, an unregistered broker or dealer engaged in interstate commerce cannot "make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security . . . ." 15 U.S.C. § 78o(a)(1).

Section 3(a)(4) defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." Factors that help determine whether an individual qualifies as a broker include whether the person is an employee of the issuer, receives transaction-based compensation rather than a salary, sells or sold securities from other issuers, becomes involved in issuer-investor negotiations, gives advice or makes valuations about the investment's worth, and is an active, not a passive, finder of investors. SEC v. Hansen, 1984 WL 2413, at *10 (S.D.N.Y. Apr. 6, 1984); see also, e.g., SEC v. Benger, 697 F. Supp. 2d 932, 945 (N.D. Ill. 2010) (noting that the Hansen factors are not exclusive); SEC v. Bravata, 2009 WL 2245649, *2 (E.D. Mich. 2009) ("The most important factor in determining whether an individual or entity is a broker" is the "regularity of participation in securities transactions at key points in the chain of distribution."); LFS Funding Ltd. P'ship, 2023 WL 6373859, at *6 ("The test is not whether compensation qualifies as a commission, but rather whether the compensation was 'transaction-based.'"); SEC v. Hui Feng, 935 F.3d 721, 731-33 (9th Cir. 2019) (affirming the district court's application of the Hansen factors).

Throughout the UPPR offering, Defendant Bryant was unregistered as a broker. (Doc No. 105-10, Ex. G, Bryant Depo. at 25:20-23, 28:1-5.) But the undisputed facts establish that he regularly participated at key points throughout the chain of distribution of

the UPPR securities. Defendant Bryant entered into an agreement to "identify capital sources to assist Growing Springs in procuring financing to advance its business expansion." (Doc. No. 105-9, Ex. F at 3.) To that end, Defendant Bryant hired and trained a group of employees to cold-call potential investors in the UPPR offering. (Doc. No. 105-10, Ex. G, Bryant Depo. at 43:2-17; Doc. No. 105-14, Ex. K, Cohen Test. at 29:6-16, 30:23-31:15.) Defendant Bryant, through his management of Project Growth, facilitated investors' investments in UPPR by offering them informational materials, answering their questions, providing them Referral Reservation and subscription agreement forms, providing instructions regarding payment, and making sure that subscription agreements were sent along to UPPR. (Doc. No. 105-10, Ex. G, Bryant Depo. at 42:4-23, 46:1-8, 59:12-60:16; Doc. No. 105-14, Ex. K, Cohen Test. at 48:16-49:11; Doc No. 105-16, Ex. M; see Doc. No. 105-17, Ex. N; Doc. No. 105-18, Ex. O; Doc. No. 105-19, Ex. P; Doc. No. 105-20, Ex. Q; Doc. No. 105-21, Ex. R; Doc. No. 105-22, Ex. S; Doc. No. 105-23, Ex. T.)

The facts also show that Defendant Bryant received transaction-based compensation for his services rather than a salary. Pursuant to the agreements between Defendants Earle and Bryant, Project Growth's compensation was a function of the amounts invested by Project Growth's referrals to UPPR. (Doc. No. 105-9, Ex. F at 3-4; Doc. No. 105-11, Ex. H at 2-3; Doc. No. 105-10, Ex. G, Bryant Depo. at 88:23-89:7, 90:1-5.) Transaction-based compensation suggests that a party must register as a broker because it "can encourage high pressure sales tactics [in conflict] with the interests of his or her client." SEC v. Murphy, 50 F.4th 832, 846 (9th Cir. 2022) (internal quotation marks omitted); see also EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC, 6 F.4th 50, 57 n.5 (1st Cir. 2021) ("Transaction-based compensation is a hallmark indication that a party has acted as a broker and must register because it represents a potential incentive for abusive sales practices that registration is intended to regulate and prevent." (internal quotation marks removed)). The fact that Defendant Bryant was paid based on the amounts his referrals invested further suggests he was acting as a broker during the UPPR offering.

In sum, the undisputed evidence shows that while Defendant Bryant was engaged in the business of effecting transactions in securities for UPPR, he was not registered with the SEC as a broker. Accordingly, Defendant Bryant violated Section 15(a) of the Exchange Act and Plaintiff SEC is entitled to summary judgment on its sixth claim in the SAC against Defendant Bryant.

## Conclusion

For the reasons stated, the Court grants SEC's motion for partial summary judgment. Specifically, the Court grants Plaintiff SEC summary judgment of its fifth claim in the SAC as asserted against Defendants Earle and Bryant and of its sixth claim in the SAC as asserted against Defendant Bryant. (Doc. No. 105.)

**IT IS SO ORDERED.**

DATED: September 30, 2024

MARILYN L. HUFF, District Judge
UNITED STATES DISTRICT COURT